AMERICAN SCIENCE AND
ENGINEERING, INC.

v.

The UNITED STATES.

No. 133–78.

United States Claims Court.

April 30, 1985.

Jeffrey S. Stern, Boston, Mass., for plaintiff.

John Fargo, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

1. *American Science and Engineering, Inc. v. United States,* 229 Ct.Cl. 47, 663 F.2d 82 (1981).

## OPINION

SETO, Judge.

This action involves a suit for breach of contract brought pursuant to 28 U.S.C. § 1491, requesting damages resulting from the government's unlawful cancellation of its 3-year exclusive "patent" license, wherein defendant granted plaintiff all the patent rights, for a 3-year period, on United States Patent Application Serial No. 726,-556 ("'556"). Since defendant has already been adjudged liable for this breach [1], this court must determine the amount of damages awardable to plaintiff for its loss of its exclusive license.

This action was originally filed in the United States District Court for the District of Massachusetts, which on July 29, 1977, issued a preliminary injunction enjoining the Department of Health, Education and Welfare ("HEW") from cancelling its patent agreement with American Science and Engineering, Inc. ("AS & E"). The District Court's injunction was dissolved on February 23, 1978, when the United States Court of Appeals for the First Circuit held that the United States Court of Claims, and not the District Court, had subject matter jurisdiction. *American Science and Engineering, Inc. v. Califano,* 571 F.2d 58 (1st Cir.1978).

The Court of Claims, after assuming jurisdiction of the case, ruled that the government was liable for wrongfully cancelling the exclusive U.S. license and revoking its waiver of foreign patent rights. *American Science and Engineering, Inc. v. United States,* 663 F.2d 82 (1981). The action was then remanded to its trial division [2] for a determination of the amount of recovery and for disposition of Counts II and III. AS & E subsequently moved to dismiss Counts II and III with prejudice, and disclaimed any damages relating to HEW's cancellation of the exclusive license

2. The trial division of the Court of Claims was transformed to the U.S. Claims Court on October 1, 1982, pursuant to P.L. 97–164, 96 Stat. 25 (1982).

in United States Patent No. 4,065,066 (the "Cable Handling Mechanism"). Therefore, the sole determination for this court is the amount of damages to be awarded for AS & E's loss of its exclusive 3-year license for the potential patent rights inherent in the '556 patent application.[3]

After a thorough consideration of all the evidence presented in a 15-day trial, which included the testimony of 17 witnesses, 179 exhibits and close to 3500 pages of transcript, as well as the post-trial briefs and 404 proposed findings of fact, the court concludes that plaintiff's recovery should be limited to out-of-pocket losses and the reasonable profits it would have made on the five confirmed computed tomography ("CT") scanner contracts which were cancelled after the government's unlawful breach of the exclusive patent license, but before the beginning of the interference proceeding. Other than for the above, plaintiff may not recover its anticipated profits or its asserted diminished value of its business.

### FACTS

AS & E was founded in 1958, employing several faculty members from the Massachusetts Institute of Technology. It initially operated as a Government contractor performing research work primarily for the Department of Defense and the National Aeronautics and Space Administration ("NASA"), and supplied some of the equipment used on space exploration projects, such as Skylab. Originally, AS & E did not manufacture products for commercial sale. As NASA research and development (R & D) contracts waned in the early 1970's, however, AS & E's management sought to make a transition from a government contractor to a manufacturer of products for the commercial market. As of 1975, over half of AS & E's revenues were derived from commercial sales.

The first significant product marketed by AS & E was an airport baggage inspection system which used X-ray scanning. AS & E marketed this system under the trademark "MICRODOSE" and sold it to various airports; these units sold for about $30,000–40,000 each and were manufactured in AS & E's Instrument Systems Division ("ISD"). Prior to its marketing of a CT scanner, however, AS & E had never marketed any medical products. While it did design a type of nuclear medicine device, called a Coincitron, in the late 1960's, it sold only four units. AS & E was therefore a neophyte in the medical product arena. In 1973–1974, Dr. Jay Stein, a research scientist at AS & E, who had already been instrumental in the design of AS & E's Microdose package inspection system, began to study the field of CT scanners.

In late 1974, the National Institutes of Health ("NIH") issued a request for proposals to build and test an improved CT scanner capable of scanning any part of the body, on a cost-plus-fixed fee basis ("CPFF"). AS & E decided to submit a proposal in collaboration with the Presbyterian Hospital of the Columbia University Medical Center ("Columbia-Presbyterian"). AS & E initially proposed to build a CT scanner for the National Cancer Institute ("NCI") which would use an X-ray source and an arc of detectors rotating synchronously around the patient, a type of design sometimes referred to as "third generation" to those skilled in the art. However, Dr. Stein was concerned that this design would suffer from inherent problems which would be difficult to correct. These problems centered around the fact that, in such a design, each detector samples the rays passing through the body at the same angle. If the response of one detector varies from that of other detectors, a ring-like artifact would appear in the image. In December 1974, Dr. Stein, together with Dr. Shepp of Bell Labs, conceived of a design where only the X-ray source would rotate around the patient and a stationary array of detectors would extend around the patient in a full circle. This stationary circular array design is

---

**3.** The '556 patent application never issued as a patent as it became entangled in an interference proceeding which continued throughout the entire 3-year license period.

sometimes called the "fourth generation" design. It obviates the ring-artifact problem because, as the source rotates, each detector samples those rays passing through the patient's body from all angles, thus allowing any variations in detector response to be uniformly distributed and avoiding this artifact.

On June 28, 1975, NCI awarded Contract No. N01–CB–53853 to AS & E, wherein the statement of work called for incorporation of the stationary circular array concept. The contract, initially for $1,092,700, was subsequently increased by modification to $1,602,223. On July 14, 1976, AS & E reported two inventions as subject to the Patent Rights Clause contained in the contract and requested an exclusive license in them. These inventions were described as a Circle Array Tomography System and a Cable Handling Mechanism. On August 27, 1976, AS & E was advised to submit a petition for an exclusive license and given permission to file patent applications on the two inventions with the understanding that the Government would take title to those inventions. On September 17, 1976, AS & E made formal application for an exclusive license to practice two inventions, which had been reduced to practice under the NCI contract. In its request, AS & E stated as follows:

By granting an exclusive license to AS & E, we will be in a position to justify the investment of further funds needed to increase production capability to enable us to offer the equipment to the greatest number of institutions at the lowest possible cost. Such investment can only be made if there is a reasonable expectation that there will be a financial return on that investment; such expectation can only be had if we are granted a period of exclusivity.

On November 10, 1976, the Acting Director of NCI replied that the grant of an exclusive license would not be in the Government's best interest because the inventions represented a sufficient advance over existing scanners and that, therefore, competitive companies also would be inter-

ested in developing and marketing such CT scanners, should they have an opportunity to do so as a result of the granting of a non-exclusive license rather than an exclusive license. On December 10, 1976, HEW patent counsel, after receiving additional information from AS & E, requested the Acting Director of NCI to reconsider its opinion advising against the grant of the exclusive license to AS & E. HEW patent counsel advised NCI that the grant of an exclusive license would not damage other CT scanner manufacturers because they would need the amount of time comprehended by the license term in order to retool to produce a stationary array scanner. Thus, these manufacturers would not be prevented from developing this type of scanner and competing with AS & E upon the expiration of the license. Based upon that advice, NCI acquiesced in the grant of an exclusive license to AS & E.

On January 21, 1977, following HEW patent counsel Norman Latker's recommendation, Dr. Theodore Cooper, the Assistant Secretary for Health, advised James Powers, the plaintiff's director of contracts and procurement, that "it is my determination that the public interest will be best served by the granting of a limited exclusive license to American Science and Engineering for a period of five (5) years from the date of the license, subject to the terms and conditions of LICENSE AGREEMENT attached hereto and made a part of this determination." The letter requested that AS & E accept the determination, and execute the LICENSE AGREEMENT. It concluded that "the LICENSE AGREEMENT will then be signed on behalf of the department and a fully executed copy returned to you." On February 16, 1977, prior to the License Agreement having been executed by HEW, Dr. DiChiro, a neuroradiologist at NIH, sent a memorandum protesting the grant of an exclusive license, stating that Ohio-Nuclear had developed a scanner having a stationary circular array, which it would formally announce shortly, and argued that HEW should not attempt to block other CT scanner manufacturers from using these inventions. It was decid-

ed that further information should be gathered and reviewed regarding the interest of others in these inventions before the license was executed. To this end, a Notice was published in the *Federal Register* on April 7, 1977, advising that HEW intended to grant a five-year exclusive license to AS & E, and inviting comments and/or objections by June 6, 1977.

The responses were evaluated by the NIH Inventions and Patents Board in a meeting held June 10, 1977, wherein the Board determined that, of all the applicants for a nonexclusive license, only Ohio-Nuclear appeared firmly committed toward manufacture of a stationary array CT scanner. NIH determined that, because Ohio-Nuclear had a dominant position in the CT scanner market, AS & E should receive an exclusive license to enable it to compete in that market.

The NIH Board, however, recommended that the license term be reduced to three years in light of the great interest shown by other CT scanner manufacturers in this technology. It sought and obtained AS & E's assent to such a change. The license agreement granted AS & E an exclusive license to practice the invention covered by the Stein '556 patent application for a period of three years from the license grant, i.e., June 17, 1977 to June 17, 1980. The license was royalty-free and limited HEW's remedies to termination in the event that AS & E breached the license. It expressly provided that AS & E could not be sued for damages. AS & E was obligated to initially bear the expense of prosecuting the Stein '556 application. The license, however, did not address the question of whether AS & E could settle any interferences involving the application without HEW's consent. The license agreement also afforded HEW the right to publish or disclose any information relating to the Stein '556 patent application, whenever it was deemed to be in the public interest. It further provided that HEW could revoke the exclusive license and/or grant nonexclusive licenses to others if it determined that the public health, safety or welfare required such action. Such a determina-

tion would be made by the Assistant Secretary for Health after notice and a hearing. If such occurred, AS & E would retain a nonexclusive license.

Under the license, AS & E had the sole right to sue for patent infringement, if and when the patent issued, bearing all the expense incurred and retaining all damage awards. Finally, the license provided, in a section of the contract entitled "Non-Use of Names", that it was *not* to be construed as a governmental endorsement of AS & E's scanner. It stated:

> This license *shall not be construed or in any way represented as constituting the endorsement by the Government of any product manufactured by the LI-CENSEE*, within the scope of this license, or of the therapeutic utility or safety of any such product.

> LICENSEE shall not use the name of the Government, nor any adaptation of the name of the Government, in any advertising, promotional or sales literature, without prior consent obtained from the government [as represented by the Assistant Secretary for Health, Department of Health, Education and Welfare] in each case. [Emphasis supplied.]

After the exclusive license was granted to AS & E, the companies who had applied for nonexclusive licenses, were informed that the exclusive license was reduced to three years, running from June 17, 1977 to June 17, 1980. They were also advised that they were free to continue their development of stationary array scanners "since there will be *no infringement until patents issue on the subject patent applications*, and CAT scanners incorporating the two subject inventions are sold." (Emphasis supplied.)

In July 1977, the grant of the exclusive license to AS & E was brought to the attention of a new Assistant Secretary for Health, Dr. Julius Richmond, who replaced Dr. Dickson. After receiving oral advice from HEW's General Counsel, Dr. Richmond apparently concluded that the exclusive license violated the Federal Procure-

ment Regulations and, therefore, was void. On July 21, 1977, Dr. Richmond sent AS & E a letter to that effect. On July 29, 1977, AS & E obtained a preliminary injunction from the United States District Court for the District of Massachusetts, enjoining HEW from proceeding with the cancellation of AS & E's exclusive license. That injunction was dissolved on February 23, 1978, when the First Circuit concluded that the district court lacked jurisdiction over the subject matter of this controversy. *American Science & Eng'g v. Califano*, 571 F.2d 58 (1st Cir.1978).

On September 27, 1976, AS & E filed Patent Application No. 726,556 for Tomography Scanning with Radiant Energy Source and Detectors Relatively Displaced, naming Jay A. Stein and Lawrence A. Shepp as inventors ("the Stein '556 application"). At the time the Stein '556 application contained five claims with claims 2–5 dependent from claim 1. At the time the Stein '556 application was filed, its subject matter had been disclosed by AS & E in technical presentations and in a brochure prepared in April 1976. In the first Office Action, dated June 6, 1977, the examiner rejected all claims as anticipated or rendered obvious by United States Patent No. 3,778,614 issued to Hounsfield and owned by EMI. This was the status of the Stein '556 application on June 17, 1977, the date the exclusive license was granted to AS & E. AS & E promptly responded to the initial rejection of claims by filing an Amendment on June 21, 1977. AS & E's then patent counsel, Mr. Heiken, pursuant to a telephone interview with the examiner on June 8, 1977, agreed to amend the claims to distinguish them from the Hounsfield reference and to provide the results of a patentability search, earlier conducted by AS & E, to expedite the prosecution.

The sole independent claim, claim 1, was amended to the following form:

Radiant energy imaging apparatus comprising,

a source of a fan beam of penetrating radiant energy located outside the region to be imaged,

an array of contiguous radiant energy detecting means located about an axis of rotation for converting incident penetrating radiant energy into a corresponding detected signal,

and means for angularly relatively displacing said source and said array about said axis and keeping one of said source and said array essentially stationary to sequentially illuminate different groups of said detecting means progressively angularly displaced about said axis to provide a sequence of detected signals representative of the radiant energy response of said region which is between the path traveled by said source relative to said array and said array.

Three additional dependent claims, claims 6–8, also were added. On July 14, 1977, the examiner issued an Office Action indicating that claims 1–8 were allowable, closing prosecution on the merits. This Office Action mentioned a personal interview with Mr. Heiken on June 21, 1977, and a telephone interview of June 28, 1977. It also noted that an examiner's amendment would follow. On July 21, 1977, that examiner's amendment was filed, amending claim 1, as discussed during Mr. Heiken's interviews with the examiner, as follows:

Radiant energy imaging apparatus comprising,

a *single* source of a fan beam of penetrating radiant energy located outside the region to be imaged,

an array of contiguous radiant energy detecting means located about an axis of rotation subtending a substantial fraction of a complete circle about said axis for converting incident penetrating radiant energy into a corresponding detected signal,

and means for angularly relatively displacing said source and said array about said axis and keeping one of said source and said array essentially stationary to sequentially illuminate different groups of said detecting means progressively angularly displaced about said axis to provide a sequence of detected signals representative of the radiant energy re-

sponse of said region which is between the path traveled by said source relative to said array and said array. (Underlining indicates words added by Amendment.)

Apparently, this amendment was entered to distinguish the claims from United States Patent No. 4,031,395, issued to LeMay on June 21, 1977, and cited by the examiner as a reference.

A Notice of Allowance was sent on September 20, 1977, and the issue fee paid on September 26, 1977. However, on September 21, 1977, the examiner requested and received permission from the Director of his Examining Group to withdraw the Stein application from issue for the purpose of establishing an interference. On September 27, 1977, the Patent and Trademark Office ("PTO") sent AS & E's counsel a notice, which was received on October 1, 1977, informing him of the decision to withdraw the Stein application from issue.

Plaintiff filed a "Petition Under Rule 181" on October 11, 1977, in an attempt to persuade the Commissioner to overturn the examiner's decision to set up an interference. It argued that if the interference was declared, AS & E would be irreparably harmed since its exclusive license would expire *before* the interference was concluded. It suggested that AS & E's patent be allowed to issue and that EMI be allowed to copy its claims, making the interference one between a patent and a pending application, rather than between two pending patent applications. The PTO, however, denied AS & E's petition on October 25, 1977. The PTO noted its statutory obligation to resolve questions of priority of inventorship and further suggested that the interference was a "burden of patent prosecution" that AS & E had agreed to assume in its exclusive license. The PTO, however, did direct that the handling of the Stein application be expedited. A Petition for Reconsideration, filed by AS & E on November 4, 1977, was denied on December 20, 1977.

The examiner's decision to withdraw the Stein application from issue was based upon the contention of patent counsel for EMI that the same invention was disclosed in Application No. 772,689, filed on February 28, 1977, by Colin Charles Oliver. On August 8, 1977, EMI filed a preliminary amendment to the Oliver application amending the claims and directing the examiner's attention to the Stein application. An incomplete copy of the specification and drawings, but not the claims, of the Stein application was attached. A second preliminary amendment was also filed on July 28, 1977, adding a new claim which broadly claimed a scanner with a stationary circular array of detectors and a rotating source. Again, the examiner's attention was directed to the Stein application. Finally, a third preliminary amendment was filed on September 19, 1977, adding claims 9-13 which were copies of claims 1-5 of the Stein '556 application. The amendment set forth the support for these claims in the Oliver application and requested that an interference be declared.

On October 27, 1977, the examiner suggested that EMI copy a claim corresponding with claim 1 of the Stein application in order to provoke an interference. EMI copied the suggested claims in an amendment filed November 22, 1977, as claim 15. On February 9, 1978, an interference was declared between the Oliver application and the Stein '556 application, with claim 1 of the Stein '556 application constituting the sole count. Oliver was given the benefit of its earlier British application, filed March 3, 1976, and was, by virtue of this earlier date, designated senior party. The Declaration of Interference in the Stein application also indicated that the primary examiner considered claims 2-8 unpatentable over the interference count, stating that they would be subject to rejection if EMI prevailed in the interference.

On February 1, 1979, a motion made by EMI to substitute a broader claim as the sole interference count was granted. The claim was copied in the Stein application and the interference was redeclared in April 1979. The substituted interference count was:

A system for examining a patient comprising,

a stationary array of detectors of x-radiation surrounding the patient at least halfway

and means for generating x-radiation at an origin of x-radiation which origin moves around the patient along a path which does not coincide with the array of detectors and successively illuminates with a fan beam of x-radiation groups of said detectors which are at the time at the side of the patient opposite that of the origin.

Subsequently, in May 1981, the interference was again redeclared as a result of EMI prevailing on a motion to substitute LeMay Application Serial No. 946,644 for the Oliver application. This had a further significant effect, since the LeMay application had a priority date of March 20, 1975, predating the priority date of Oliver's British filing date by about one year.

A settlement of this interference was reached between the Government and EMI on September 17, 1982, with the Government abandoning the interference contest and receiving a royalty-free nonexclusive license under EMI's patents to the extent necessary to practice the interference count.

## SUMMARY OF RELEVANT DATES AND EVENTS

March 2, 1976   The date AS & E announced its entry into the CT scanner market.

September 27, 1976   AS & E's Stein application filed.

January 21, 1977   The date AS & E was notified that it could expect to receive an exclusive license.

June 17, 1977   The government (HEW) grants AS & E a three-year exclusive, revocable and non-assignable license to practice, the invention covered by the patent rights in the Stein '556 patent application, to end June 17, 1980.

July 14, 1977   Examiner states that the claims in plaintiff's Stein application are allowable.

July 21, 1977   Government cancels 3-year exclusive license.

September 20, 1977   Notice of Allowance mailed by PTO.

September 21, 1977   The PTO requests that the Stein application be withdrawn from issue in order to establish an interference with EMI's Oliver application.

September 27, 1977   AS & E given notice that interference was imminent.

October 1, 1977   Stein application withdrawn from issue.

February 9, 1978   Interference declared by PTO (using claim 1 of the Stein application) between Stein application and EMI's Oliver application.

June 17, 1980   Date exclusive license would have ended (if it had not been cancelled by the government).

May 1981   PTO re-declared the interference substituting EMI's *LeMay* application for its *Oliver* application against the *Stein* application.

September 17, 1982   Settlement reached on interference action before PTO wherein the government admitted that the *LeMay* application had priority of invention as to the subject matter of the count in said interference by virtue of having disclosed such subject matters in its U.K. patent application filed on March 20, 1975. The government in turn received a royalty-free, irrevocable, nonexclusive license under EMI's patent to the extent necessary to practice the interference count.

### The Technology

X-ray technology in general is based on the fact that different kinds of tissue attenuate (by means of scattering or absorption) X-rays in different ways. Specifically, there are strong differences between attenuation of X-rays by bone as distinguished from soft tissue. Conventional X-ray has several limitations. Because it creates a two-dimensional image, certain features

can be superimposed or masked. Moreover, it can be difficult, or impossible, to distinguish between different kinds of soft tissue, which are similar in their X-ray attenuation characteristics. Computed tomography overcomes these limitations of conventional X-ray, by reconstructing a thin "slice" of a patient, and is capable of distinguishing between different kinds of soft tissue, which are similar in their X-ray attenuation characteristics. CT scanners use X-rays to produce a cross-sectional image of a patient's body. CT scanners avoid some of the limitations of conventional X-ray devices; namely, the superimposition of all tissues in the path of the X-ray beam onto the image and the inability to differentiate between tissues having similar densities. All CT scanners, whatever geometry is used, go through two distinct operations; the first is to collect a series of different angular projections, attenuation profiles or views of the slice of interest. The second is to reconstruct an image of the attenuation differences that occur in the slice.

Essentially, CT scanner images are produced by projecting X-rays through the cross-sectional area to be imaged at various angles. These X-rays are detected after exiting the patient and the decrease in energy, or attenuation, of the X-rays reflects density of the tissues in the rays' path. These attenuation profiles are convolved using a mathematical function, to quantify the differences in attenuation of the various rays. The convolved attenuation profiles are then back-projected onto a matrix yielding attenuation coefficients corresponding to the density of each matrix element. These matrix elements correspond to the picture elements, or pixels. Thus, the various shades of grey are associated with the relative values of the attenuation coefficients, resulting in a visual display of a cross-sectional image. The reconstructed data is then presented to the radiologist through a cathode ray tube (CRT) image, in which various shades of grey correspond to different levels of X-ray attenuation, through hard-copy film images of the CRT screen, or through computer printouts which give the "CT number" for each point ("pixel") in the matrix that represents a slice of interest.

CT scanners can also display the attenuation coefficients in a particular region of interest quantitatively, using a relative density scale. Typically, water is assigned a value of "0", dense bone "1000", and air "–1000". These relative density values are called CT numbers, or sometimes Hounsfield units, and may be displayed on a computer printout or on the CRT.

The following are technical terms used to evaluate CT systems:

"Spacial resolution" or "spatial modulation"—that is, in rough terms, the ability of a CT unit to "see" small objects. In technical terms it is measured by the modulation transfer function, which is the relationship between amplitude response and spacial frequency. The point at which amplitude response approaches "0" is referred to as the "limiting spacial frequency" (measured in cycles per centimeter, or line pairs per centimeter). The greater the number of cycles per centimeter, the smaller the objects that a CT unit can "see", and the better the spacial resolution.

"Contrast resolution"—this refers to the ability of a CT unit to detect differences between kinds of tissue that are similar in their X-ray attenuation characteristics.

"Noise"—this term refers to fluctuations in a CT image, similar to the "snow" one sees on a television set. It is generally measured by means of a standard deviation.

"Field homogeneity"—this refers to the ability of a CT unit to give a uniform reading (in terms of CT numbers) across a uniform field.

"Slice thickness"—this is simply the thickness of a slice that is reconstructed. Thinner slices produce better images and have fewer artifacts, because each picture element ("pixel") actually represents an average value for a volume element ("voxel").

"Artifacts"—as the name suggests, this is something that appears in a CT image,

that does not conform to something actually in the body. There are a number of different types of artifacts encountered, such as "cupping" artifacts, "ring" artifacts, and many others.

"Dose efficiency"—the ability of a CT scanner to utilize the X-rays reading a patient to actually reconstruct the image, measured as a percentage.

### The Four Generations of CT Scanners

CT scanners are often classified into four generations according to the configuration of their detector array relative to their X-ray source. First generation scanners, which were the first CT scanners, have a single detector which receives a pencil beam of radiation from an X-ray source on the opposite side of the patient. In these scanners, the source and detector are moved linearly across the patient and then the source/detector assembly is rotated, typically 1°, and the procedure is continued until an incremental rotation of 180° has been completed. These scanners are referred to as "translate/rotate" or "two-motion" scanners. Such scanners, which include the EMI, ACTA, and Pfizer, required 4–6 minutes in order to complete a scan. Thus, the first-generation geometry used a rectilinear, one X-ray source, pencil beam, and one detector moving in a linear fashion, then rotating (generally 1°) and repeated this movement throughout the 180° arc.

Second generation CT scanners are a variation of first generation CT scanners in which the source emits a fan beam of radiation which is detected by a group of detectors. Thus, while a translate/rotate motion is still used, the rotational increments are about 10° cutting the scan time to about 20 seconds. Both the first and second generation CT scanner units are sometimes referred to as "translate/rotate" systems. Second generation CT scanners include the EMI 5005, introduced in the Spring of 1975; the Ohio-Nuclear Delta 50FS, introduced in 1975; and the Pfizer 0200FS, introduced by 1976. In addition, these second generation CT scanners were able to scan any part of the body, rather than just the head.

Third and fourth generation CT scanners are two approaches to the problem of completing a scan in 10 seconds or less, each CT scanner having its own advantages and disadvantages. The third generation CT scanner uses a continuously rotating pulse fan beam of X-rays, detected by a group of detectors arranged along a portion of a circle, typically about 40°, opposite the source. The source and detector assembly rotate synchronistically around the patient, allowing the scans to be completed in less than 10 seconds.

Fourth-generation CT scanners use a rotating source, but a stationary array of detectors completely encircling the patient, rather than comprising only a portion of a circle. Thus, the fourth-generation CT scanner uses a rotating X-ray source and stationary multiple detectors. This allows scans to be performed in 10 seconds or less. The fourth-generation CT scanner is most commonly called the "stationary detector array" scanner. See diagram below.

The AS&E Scanner

| Company | Model | Strengths (as of June 1977) |
|---|---|---|
| AS&E | Fourth Generation Stationary Detector Array CT Scanner or | — fourth-generation CT scanner<br>— simplicity of design<br>— eliminated third generation problem of "aliasing" |

| The AS&E Scanner | | |
|---|---|---|
| Company | Model | Strengths (as of June 1977) |
| | Array CT NCI Proto-types | — eliminated most third generation problems of "ring artifacts" |
| | | — allowed the detector to see the "raw radiation beam" |
| | | — excellent image quality |
| | | — clinical operation in June of 1977 |

| AS&E's Major Competitors as of June 1977 | | |
|---|---|---|
| Company | Model | Description of CT Scanner |
| EMI | 505 | — second generation CT scanner only |
| | | — a "slow" scanner, needed 18–20 seconds exposure |
| EMI | 7070 | — not in clinical operation until 1979 |
| | | — had serious reliability problems in the field |
| | | — complex design caused manufacturing problems |
| | | — was not a true fourth generation scanner |
| General Electric | 7800 | — third generation scanner |
| | | — not a fourth generation scanner |
| | | — substantial problems with ring artifacts and aliasing |
| | | — poor image quality |
| | | — poor spacial resolution |
| Ohio Nuclear | 2020 | — fourth generation, but not in clinical operation until Summer of 1979 |
| | | — had continued technical difficulties through 1980 |
| Picker Corp. | 600 | — not in clinical operation until Summer of 1978 |
| | | — had significant technical problems |
| | | — was not ready for market until 1979 |

## DISCUSSION

In requesting reimbursement of all its losses, AS & E predicates its argument on the following theories: (1) that it should recover its losses based upon what it estimates it would have earned (anticipated profits) for the sale of its CT scanners during the 3-year exclusive license period (June 17, 1977 to June 17, 1980) (a) if the cancellation of the 3-year license had not occurred, (b) if the interference had been settled within the 3-year period instead of lasting over four years, (c) if the settlement had been favorable to plaintiff instead of unfavorable to plaintiff as the facts indicated, and (d) if a patent narrower in scope (divisional or continuation) had successfully issued within the 3-year license period, instead of not issuing at all, as the facts demonstrated; (2) that in calculating these losses (or anticipated profits) the court should consider the loss AS & E suffered as a result of losing the government's "stamp of approval" or "imprimatur" with the cancellation of the 3-year exclusive license; (3) that it should be reimbursed for the diminished value of its business caused by the cancellation of its 3-year exclusive license; (4) that it should be reimbursed for its purported loss of related foreign patent rights; and (5) that it should be awarded its proven out-of-pocket losses.

## I. *Recovery of Anticipated Profits*

Plaintiff asserts that its losses, in the form of anticipatory profits, can be proven with reasonable certainty, are not speculative, and were solely caused by the government's cancellation of its 3-year "patent" license. Plaintiff, in order to prevail on this theory, must sustain its burden of demonstrating: (1) that the government's cancellation of its 3-year "patent" license was the substantial cause of its loss of sales (anticipated profits), i.e., that there were *no* other substantial causes for its loss of sales, nor any intervening causes, *De Long Corp. v. Lucas,* 278 F.2d 804, 810 (2nd Cir.1960), *cert. denied,* 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960) (in order to establish liability, plaintiff must show that defendant's breach was "a substantial factor" in causing the injury); and (2) that such losses were not speculative, but rather could be proven with reasonable certainty, *Roberts v. United States,* 357 F.2d 938, 174 Ct.Cl. 940, 946 (1966) (plaintiff was not entitled to recover for defendant's unwarranted interference with plaintiff's performance, because of plaintiff's failure to produce satisfactory proof, with reasonable accuracy, of the extent of its claimed losses).

### A. *Intervening Cause*

In *Harvey Ward Locke v. United States,* 283 F.2d 521, 151 Ct.Cl. 262 (1960), our

predecessor court held that an "intervening efficient cause" precludes the type of recovery plaintiff seeks:

> But an injury to be foreseeable must be the natural and proximate result of the breach. *There must be no intervening efficient cause.* The injury may be only indirectly produced but it yet must be capable of being traced to the breach with reasonable certainty. [283 F.2d 521, 151 Ct.Cl. 262, 270 (1960) (Citations omitted) (Emphasis supplied).]

*See also Willems Industries, Inc. v. United States,* 295 F.2d 822, 155 Ct.Cl. 360, 376 (1961) (the measure of damages to be applied is irrelevant until the claimant has established the fact that the losses were the natural and proximate result of the breach of contract); *Nolan Brothers, Inc. v. United States,* 405 F.2d 1250, 186 Ct.Cl. 602, 610 (1969) (plaintiff could not recover anticipated but unearned profits without clear and direct proof that it would have made such gains, citing *United States v. Penn Foundry & Mfg. Co., Inc.,* 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949) and *United States v. Behan,* 110 U.S. 338, 344, 4 S.Ct. 81, 83, 28 L.Ed. 168 (1884).)

As countervailing authority, plaintiff cites three cases: *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634 (8th Cir. 1975); *Standard Machinery v. Duncan Shaw Corp.,* 208 F.2d 61 (1st Cir.1953); and *Harvey Ward Lock v. United States,* 283 F.2d 521, 151 Ct.Cl. 262 (1960). The first two cases are easily distinguishable from the instant case since neither contain an "intervening efficient cause" as does the case at bar, i.e., the interference proceeding. The third case, *Harvey Ward Locke,* refutes rather than supports plaintiff's contentions. While the facts of the case present an "intervening efficient cause" over and above the government's breach, the court held that this "intervening efficient cause" precluded the government's breach of contract from being the proximate cause of the loss to plaintiffs. *Harvey Ward Locke,* 283 F.2d 521, 151 Ct.Cl. at 270.

In order to comprehensively understand the case at bar, however, we must examine three basic scenarios that were possible:

1. *First Hypothetical*

(a) Plaintiff is granted a 3-year exclusive license for all the patent rights under plaintiff's '556 patent application;

(b) Early during the 3-year term, e.g., during the first month, the patent issued;

(c) Shortly thereafter, e.g., the following month, the government breaches its contract by cancelling its 3-year exclusive license contract;

(d) No interference occurs at all;

(e) Plaintiff sues government for losses due to breach of 3-year exclusive license, asserting that, if the government had not cancelled the exclusive license, it would have been able to, with an issued patent for almost all 3 years, exclude all others from making, using, and selling their fourth-generation CT scanner, plaintiff being the sole supplier of that invention.

2. *Second Hypothetical*

(a) Plaintiff is granted a 3-year exclusive license for all the patent rights under plaintiff's '556 patent application;

(b) Early during the 3-year term of the license, e.g., during the first month, the patent issues;

(c) Shortly thereafter, e.g., the following month, the government breaches its contract by cancelling its 3-year exclusive license;

(d) An interference is declared and continues throughout the entire 3-year term of the license; and

(e) Plaintiff sues, asserting that if the government had not cancelled the 3-year exclusive license, it would have been able to, with the issued patent for almost all of the 3 years, exclude all others from making, using, and selling their fourth-generation CT scanner, assuming plaintiff ultimately won its interference within the 3-year period, since plaintiff was the sole supplier of that invention.

3. *Third Hypothetical* (case at bar)

(a) Plaintiff is granted a 3-year exclusive license for all the patent rights under plaintiff's '556 patent application;

(b) Early during the 3-year term of the license, e.g., during the following month, the government breaches its contract by cancelling its 3-year exclusive license contract;

(c) Somewhat thereafter, e.g., about 6½ months later, an interference is declared and continues throughout the entire 3-year term of the license;

(d) The patent *never* issues during the 3-year term of the license;

(e) Settlement of the interference does *not* occur until over one year subsequent to the termination of the 3-year term of the license;

(f) Plaintiff sues for its losses based upon what it estimates it would have earned:

(1) If the cancellation of the 3-year license had not occurred;

(2) If the interference had been settled within the 3-year period instead of lasting over the 3-year period;

(3) If the settlement had been favorable to plaintiff, instead of unfavorable to plaintiff as the facts demonstrated; and

(4) If a patent (divisional or continuation) had successfully issued within the 3-year license period, instead of not issuing at all as occurred in this instant case.

While the court will not address the ultimate legal consequences of the first two hypotheticals it has posed, it suffices to state that had plaintiff's facts been subsumed under either the first hypothetical or second hypothetical, it is self-evident that plaintiff's argument would be much stronger than it actually is in its present posture.

Under the first hypothetical, plaintiff would have at least been able to aver that, but for the cancelling of the 3-year exclusive license contract, plaintiff would have been able to exclude others from making, using, or selling its invention since it possessed an issued patent, plaintiff having the sole possession of all the patent rights under the '556 "issued patent". Under the second hypothetical, plaintiff's position would have been somewhat less persuasive, since despite having an issued patent, plaintiff's patent rights were under a cloud inasmuch as the '556 "patent" was involved in an interference proceeding, wherein plaintiff could have lost part or all of its patent rights should the opposing side have won the interference proceeding.

Under the third hypothetical, which is illustrative of the facts of the instant case, plaintiff's burden is to demonstrate that its lost profits, from alleged potential sales loss and from alleged diminished sale prices of its CT scanner business, were the natural and proximate result of the government's breach of contract, without the existence of any "intervening efficient cause", *Harvey Ward Locke*, 283 F.2d 521, 151 Ct.Cl. at 270, thus, plaintiff must demonstrate that the 4½-year interference proceeding did not constitute an "intervening efficient cause". *Id.* Moreover, plaintiff has the burden of showing that, even without an issued patent, thus being *helpless* to exclude others from making, using, and selling its fourth-generation CT scanner, it still could have competed as a neophyte in the CT scanner market. Additionally, plaintiff must demonstrate that the 4-year interference proceeding did not further weaken its ability to compete as a neophyte against the established giants of the CT scanner industry.

Defendant asserts that this interference proceeding, which lasted four and one-half years throughout the entire 3-year exclusive license, is an "intervening efficient cause", and is therefore fatal to plaintiff's case. *See Harvey Ward Locke*, 283 F.2d 521, 151 Ct.Cl. at 270. We agree. Plaintiff, however, rather than responding directly to defendant's intervening cause argument, attempts to circumvent it by asserting that the interference, in fact, should never have lasted as long as it did, arguing that it should have been settled well within the 3-year license period. Plaintiff's assertion is based upon several

speculative premises it wishes the court to adopt: (1) had the 3-year license not been breached, plaintiff would still have been in full charge of prosecuting the '556 application and all collateral matters, such as an interference; (2) if it had handled the interference, instead of the government, it would have used more diligent efforts to obtain a settlement; (3) if a settlement were not reached within the 3-year license period, it would have obtained a divisional patent to protect smaller features of the AS & E fourth-generation CT scanner; (4) if the settlement were successful within the 3-year term, AS & E, under the settlement, would have conceded priority to EMI on certain patent claims and EMI would have received a broad patent on fourth-generation CT scanner technology, and AS & E would have obtained a narrow patent; and (5) AS & E's patent would have been limited to a fourth-generation CT scanner having a single X-ray source and a stationary array of detectors extending in a complete circle around the patient.

Our court and our predecessor court, the United States Court of Claims, however, have consistently held that, absent evidence to the contrary, there is a presumption that the actions of a government agency are correct and proper. *See Lewis v. United States*, 279 U.S. 63, 73, 49 S.Ct. 257, 260, 73 L.Ed. 615 (1929); *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Prevado Village v. United States*, 3 Cl.Ct. 219, 226 (1983); *Kalvar Corp. v. United States*, 543 F.2d 1298, 211 Ct.Cl. 192, 198–199 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Sun Oil Co. v. United States*, 572 F.2d 786, 215 Ct.Cl. 716, 746 (1978); *Librach v. United States*, 147 Ct.Cl. 605, 612 (1959); *Hoel-Steffen Constr. Co. v. United States*, 684 F.2d 843, 231 Ct.Cl. 128, 141 (1982); *Harris Systems Int'l Inc. v. United States*, 5 Cl.Ct. 253, 262–263 (1984); *C & L Constr. Co. v. United States*, 6 Cl.Ct. 791, 804, 805

(1984); *Carrier Corp. v. United States*, 6 Cl.Ct. 169, 176, 177 (1984).

■ Therefore, because plaintiff has not adduced any evidence to demonstrate that the government's patent attorney acted improperly during the interference proceeding, we must find that the government's actions during the interference proceeding were proper and correct. Plaintiff is therefore precluded from concluding that the interference proceeding should have been settled during the 3-year time period and that a patent should have issued during this period, i.e., July 17, 1977 to July 17, 1980.

■ Once having established the fact that a patent should *not* have necessarily issued during the 3-year exclusive license period, plaintiff, if it is to prevail, must establish that the 4-year interference was not an "intervening cause" so as to preclude recovery for anticipated damages, i.e., that even without the protection of an actual patent, but solely with the 3-year exclusive inchoate "patent" license, it could have competitively competed in the marketplace despite being a neophyte in this field.[4] Plaintiff concedes that one cannot exclude others from making, using, or selling its claimed invention without the protection of an issued patent. *See Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 491, 62 S.Ct. 402, 404, 86 L.Ed. 363 (1942), *reh'g denied*, 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222 (1942); *Crown Die & Tool Co. v. Nye Tool Works*, 261 U.S. 24, 35, 43 S.Ct. 254, 256, 67 L.Ed. 516 (1923); *United States v. American Bell Telephone Co.*, 167 U.S. 224, 239, 17 S.Ct. 809, 810, 42 L.Ed. 144 (1897); 35 U.S.C. § 154. *A fortiori*, once a patent issues, it is only these rights, i.e., the right to exclude others from making, using, or selling the invention, which may be the subject of a license. *Rock-Ola Mfg. Corp. v. Filben Mfg. Co.*, 168 F.2d 919 (8th Cir.1948), *cert. denied*, 335 U.S. 892, 69 S.Ct. 249, 93 L.Ed. 430 (1948). There is, however, no such right in

---

**4.** Plaintiff must now argue its case without the help of an issued patent, i.e., that there still was a certainty of profits from the sale of its CT

scanners despite the lack of any patent protection.

a patent application. While there is always a right to license know-how and trade secrets, no such affirmative contention was adduced by plaintiff. Thus, until a patent issued, the government had no right to exclude others from making, using, or selling the fourth-generation CT scanner; therefore, it could not convey such rights to AS & E. *Republic Eng'g & Mfg. Co. v. Moskovitz*, 376 S.W.2d 649, 141 U.S.P.Q. 409, 414 (Mo.Ct.App.1964), *cert. denied*, 379 U.S. 837, 85 S.Ct. 72, 13 L.Ed.2d 44 (1964).

■ Conversely, any invention, when it is disclosed to the public without protection of an issued patent, becomes public property, and the fact that it may have been made popular by advertising and expenditure of effort, time and money by the originator, does not alter this situation. *Affiliated Enterprises v. Gruber*, 86 F.2d 958 (1st Cir.1936). Moreover, competitors are free to manufacture and sell an invention even while that invention is the subject of a *pending* patent, and this manufacturing and selling does not invade the rights of the subsequent patentee if and when the

patent issues. *Ressinger v. Sears Roebuck & Co.*, 62 F.Supp. 158 (N.D.Ill.1945).

The second prong of plaintiff's argument appears to be that the interference proceeding was still not an "intervening efficient cause" because, plaintiff maintains, the stamp of approval of the government alone, i.e., the "imprimatur", would have been sufficient to allow plaintiff to successfully compete as a neophyte in the CT scanner marketplace, even without an issued patent. We disagree.

AS & E contends that its loss of profits was solely caused by its loss of the government's "imprimatur" effectuated by AS & E receiving a 3-year exclusive license of the Stein "patent" when and if the '556 Stein application ever issued. Actually, all AS & E received, was an *inchoate* "imprimatur," since the predicate of the "imprimatur" was the fruition of the exclusive license, and the predicate of the fruition of the exclusive license was the issuance of the '556 Stein application into a patent, an event which never occurred. See chart below.

Inchoate Imprimatur

Since the '556 Stein application never issued as a patent during the 3-year exclusive license period, nor later, AS & E never received the government's full "imprimatur", but rather retained solely an inchoate

unenforceable "imprimatur", i.e., it had no right during the 3-year period to exclude others from making, using or selling its fourth-generation stationary-detector array CT scanner. Moreover, even if the patent

had issued, and AS & E had the right to exclude others from making, using or selling its fourth-generation stationary-detector array CT scanner, there apparently were no infringing scanners to exclude during the years 1977, 1978 and early 1979.[5]

As earlier demonstrated by the chart entitled "AS & E's Major Competitors as of June 1977", the major competing CT scanner machines, the EMI 505, the EMI 7070, and the G.E. 7800, were not fourth-generation scanners. And while the Ohio Nuclear 2020 and Picker 600 may have been fourth-generation CT scanners, they both were unavailable in the marketplace in 1977 and 1978. Therefore, even if AS & E had retained its exclusive license, and assuming arguendo, that a patent did issue within the 3-year time period, AS & E still could not have utilized its "exclusivity rights" of its exclusive license, since there apparently were no competitors selling infringing CT scanners at that time, i.e., 1977 or 1978. Additionally, the 3-year exclusive license itself stated that the awarding of the 3-year exclusive license to AS & E should *not* be construed to be a governmental endorsement of AS & E's CT scanner. The license states in relevant part:

This license *shall not be construed or in any way represented as constituting the endorsement by the Government of any product manufactured by the LICENSEE,* within the scope of this license, or of the therapeutic utility or safety of any such product.

LICENSEE shall not use the name of the Government, nor any adaptation of the name of the Government, in any advertising, promotional or sales literature, without prior consent obtained from the government [as represented by the Assistant Secretary for Health, Department of Health, Education and Welfare] in each case. [Emphasis supplied.]

**B.** *Other Substantial Causes of Plaintiff's Losses*

Finally, plaintiff does not adduce any evidence to demonstrate that its loss of its "imprimatur" was the *sole* reason that it lost fourth-generation CT scanner orders, i.e., that there were no other substantial factors that may have significantly contributed to plaintiff's loss of sales of CT scanners during the 3-year period. Rather, the opposite is true; the evidence is replete with customer complaints manifesting plaintiff's inability to market, maintain, and repair its fourth-generation CT scanner. For instance, Dr. William Hendee of the University of Colorado Medical, complained to AS & E as follows:

[A]s we discussed by telephone a couple of weeks ago, since installation of our AS & E scanner *we have experienced considerable down time which has prevented us from meeting our clinical operations in any way approaching that which is necessary.* This down time problem continues to exist for first one reason, then another, with no indication that it will be remedied in the immediate future. [Emphasis supplied.]

In a letter dated August 9, 1978, from Johns Hopkins University School of Medicine and Johns Hopkins Hospital to AS & E complaining about AS & E's fourth-generation CT scanner, the hospital states:

"On August 15 and 16, 1978, (Tuesday and Wednesday) the AS & E will be down to complete the 5-second modification, as well as to accomplish as many of the following open items as possible. These open items are an accumulation of things that should have been done since the system was first installed; up to and including present work that must be accomplished. *Our AS & E system, visually and functionally, does not look or act like a high priced, high quality scanner. Things are lacking cosmetically, as well as functionally for the*

---

**5.** While we make no finding on infringement of the claims of the '556 Stein application *per se,* we assume that claims covering a fourth-generation CT scanner would not be infringed by second- or third-generation CT scanners. *See* chart regarding AS & E's major competitors in 1977, *supra.*

*equipment to be deemed acceptable."* [Emphasis supplied.]

The letter goes on to state specifically a number of problems and continues:

These problems added to our other daily operational problems of data drop outs, snow pictures, detector failures, bed positioning glitches when powering up system, rotary motor clutch drop out, overload of bed fuses under normal operation, overheating of the DCL logic boards, no angular table read out device and finally pictures with beam hardening shadows, leave me with a large question as to when these problems will be resolved.

An internal memorandum of AS & E dated August 26, 1977, clearly reflects the internal production problem AS & E was experiencing during this period, i.e., the inability to smoothly produce their fourth-generation CT scanner. In the memorandum from G.W. Alrich to J. Stein, Mr. Alrich states:

"As you know, we are in an incredible crunch to produce and ship units. Recently we have had a series of destructive incidences in which production scanners have been cannibalized for parts needed in various development projects.

This has, in effect, taken computer systems that were finished and checked out and turn them into a non-working piece of equipment. We then need more money and more labor time to put them back into acceptable condition. Some of these incidences occur after hours and others occur during the day. Dan Silva and other production people are not informed.

We have lost equipment and we have equipment that is not usable. Nobody wants to hold up any development project; but midnight requisitioning and contempt for the production people is wrong."

Children's Hospital in Pittsburgh, Pennsylvania, also complained about AS & E's fourth-generation CT scanner, in the following aspects: (1) high standard deviation; (2) streaks on scan in 5-second mode; (3) the spacial resolution is down by 75%; (4) AYDIN display warmup problem; (5) metal chips getting into X-ray port; (6) intermittent mechanical interlock; (7) slice thickness; (8) CT drift; (9) warranty; and (10) site coverage. While AS & E apparently intended to resolve all of the above problems as soon as they could, there were other problems that AS & E had no plans to resolve. Among these problems mentioned were: (1) head holder; (2) sagital and coronal reconstruction; (3) program for localization; (4) continued software update for model no. 0500; (5) rotor artifact; (6) change in collimator system to reduce dose; (7) CT number stabilization correction system; and (8) improved X-ray tube.

A letter from the Michigan State University Department of Radiology from Dr. E. James Potchen, Professor and Chairman of the Radiology Department of Michigan State University, complained strongly about the quality of the AS & E fourth-generation CT scanner:

The software supply to MSU must be convenient for radiologists to employ in the clinical setting and must produce a clinically useful image. In accord with your statement that 'everything AS & E produces is first-class', *I certainly will not accept a crude or multi-planar reconstruction software update.* [Emphasis supplied.]

In regard to his complaint regarding "high image noise", Dr. Potchen stated:

No progress has yet been made in completing the installation of the 5-second scanning mode. Our images remain objectionably mottled in appearance, and, clearly, the image quality is not commensurate with the delivered patient doses and the image quality of other AS & E machines.

A letter from Cyprus Community Hospital in Pompano Beach, Florida, written by Dr. Joseph V. Cusmano, states:

I am writing to express my *disappointment and disgust with the performance of your company relating to your* contract to deliver to my group a CAT scanner at Cyprus Community Hospital in Pompano Beach, Florida.

At the time of our down payment, we contracted for delivery on or about December 15, 1976. I was informed later that delivery was firm for the third week in Febuary [sic]. This was disappointing enough but, for months, this date was re-affirmed repeatedly by your representative. Based on this, we will have completed a room for acceptance of the unit by Febuary [sic] 15, 1977. This was accomplished at considerable expense, and in spite of numerous changes and other obstacles presented by deficiencies in your company's various departments. I called this morning to inform your people that we will be ready and was told that delivery was delayed again until March 18! Mind you, *I had to call your company* to find this out! Further, small petty jokes were made in regard to this shocking news. [Emphasis supplied.]

Dr. Cusmano further added in his letter to AS & E:

May I point out that *American Med. Corps. has been observing this purchase with interest and now I am sure with similar disgust and outrage.* Through personal efforts, I arranged for Mr. Paul Powell, the Chief Purchasing Agent, to visit your facility and indeed he is alot smarter than I am, for he perceived the *inability of your company to produce on any kind of schedule. You can be sure AS & E is a dead horse with AMI now, which incidently has caused me much personal humiliation.*

*Contracts between our construction people and your firm has resulted in a stream of negative invectives against AS & E!* I have been put in a position of having to continually defend your company! But, now I have had it. The crowning blow was that I had to call to get the bad news! What kind of business are you running up there? [Emphasis supplied.]

A letter from Dr. William B. Seaman of the Surgeons of Columbia University, New York, complains about the excessive down time of the AS & E fourth-generation scan-

ner, the slow patient throughout, and the need for an improved camera. In regard to the down time, Dr. Seaman states:

Although I have not kept adequate records, the *down time so far has exceeded the operational time.* This is true even including operating the machine when serious artifacts are present in the image.

The inability of AS & E to market its fourth-generation CT scanners in a professional manner was also perceived within its own corporate structure. In an internal AS & E memorandum dated August 3, 1977, from James E. Powers to Martin Annis, President of AS & E, Mr. Powers states:

Received a call from Roy Erickson, President of Ball Memorial about 4 p.m. today notifying me that they were sending a cable to you cancelling their order. He stated that there are two basic reasons were *delay in delivery and continued uneasyness (sic) regarding the service capability* to be provided by AS & E in Muncie. I asked him what we could do to allay these unfounded fears and he said there was nothing, since they have had meetins [sic] regarding this procurement and the Board of Directors had voted this today." [Emphasis supplied.]

Also exacerbating AS & E's marketing problems during the June 17, 1977 to June 17, 1980, 3-year license time period, was the substantial and contemporaneous decline, within the medical marketplace itself, for CT scanners themselves. In an article entitled "History of the CT Scanner Industry", published in *Biomedical Insight*, it stated as of December of 1977, "Industry reportedly experiencing *shrinking demand coupled with overcapacity.* 1978 will be a stand-still year for the industry with an expected 100–200 units delivered." [Emphasis supplied.] Moreover, the summary adds as of March 1978, "EMI plunges into red drops U.S. work force by 30%; now has suits against Pfizer and GE and expands suits against Technicare. Technicare also dropping financially as demands shrink due to C.O.N. (certificates of need) ceiling."

In an internal Pfizer sales memorandum entitled "Key Market Factors" relating to the U.S. market for CT scanners, Pfizer states:

1977 witnessed the unequivocal acceptance of the CT of the head as a primary modality for diagnosis of pathology of the brain ... Despite portents of increasing long-term demand for scanners, however, *the size of the domestic CT market in 1978 will be defined by the number of certificates of need (C.O.N.) issued by the state health planners.* Virtually every state in the nation now has regulatory authority over the purchase of CT scanners by hospitals either through Public Law 93–641, which establishes certificate of need requirements, or Section 1122 of the Social Security Act, which provides for withholding Medicare and Medicaid reimbursement for a hospital's capital investment unless the expenditures are approved by the state review authority. In addition, *private purchase of CT scanners is now restricted in 22 states, either by a state requirement that an individual obtain a certificate of need,* or by a Blue Cross/Blue Shield policy requiring a certificate of need as a condition of reimbursement.

Although the same regulatory structure existed a year ago, *it was not anticipated that it would be utilized so zealously by health planners and legislators to clamp down on CT scanners, whose high visibility and price tag made them a natural target of cost containment efforts.* [Emphasis supplied.]

The internal memorandum continues by stating that the figures demonstrate a 16% decline of CT scanner sales from the full 1977 estimate and a 47% reduction of CT scanner sales from 1976.

In the *Biomedical Insight* publication of December 21, 1977, regarding the market decline for CT scanners, the report stated:

For the first time since 1973, there were longer odds and longer faces on more than one CT scanner entrant, as more of the combatants in this hot, high-ticketed industry start to feel the *chill of a shrinking demand,* coupled with gross overcapacity and the widespread abundance of technological overkill. Combined, they are helping to forecast 1978 as a cheerless selling climate in the U.S., worse than has occurred at any time during the past half-decade.

*The overall scanner situation is much worse than anyone involved in that industry will readily admit.* Lower-priced units, o.e.m. deals and marketing stunts are a sure sign of troubles. The 15 companies currently are competing in the U.S. for under 100 outstanding, unfilled and uncommitted certificates of need. [Emphasis supplied.]

AS & E itself even admitted that the outlook for CT scanner sales, during this particular time period, appeared grim. In an internal AS & E memorandum dated November 10, 1977, AS & E also recognizes the restrictive ramifications of the certificates of need, saying:

The federal guidelines will affect all new CT certificates of need. Most of the customers don't realize to what extent and will be miffed when their certificates of need are denied.

We therefore also find that AS & E's failure in the marketplace, during the 3-year license period, to competitively sell its fourth-generation stationary array CT scanner, was due to a substantial extent, to its own inability to market and service its own fourth-generation CT scanners and the concomitant decline in demand, during this 3-year time frame, for CT scanners in general.

We are therefore constrained to reach the ineluctable conclusion that AS & E's loss of the government's inchoate "imprimatur" or "stamp of approval" was *not* the only substantial cause of AS & E's losses of CT scanner sales during the 3-year time period. Rather, at least three other substantial factors adversely affected AS & E's ability to effectively market its fourth-generation CT scanner: (1) the interference proceeding which debilitated the effective-

ness of the "imprimatur" by transforming it (by preventing the patent from issuing) into an "inchoate imprimatur"; (2) the inability of AS & E's own sales and service organization to effectively market, service, and repair its own CT scanner machine; and (3) the concomitant decline for CT scanners during this 3-year time period, due to the narrow construing of the certificates of need. We further conclude that, arguendo, even if one of these factors standing alone would not qualify to be an "intervening efficient cause", that the simultaneous impact of all three of these factors qualifies as an "intervening efficient cause" sufficient to preclude plaintiff from the right to receive reasonable damages for its future anticipated profits from the sale of its fourth-generation CT scanners, or for the purported diminished value of its business caused by the cancellation of its 3-year inchoate exclusive patent license.

## II. *Uncertainty Of Its Anticipated Profits (lost sales or diminished value of its business)*

■ Even if, arguendo, there were no "intervening efficient cause", *Harvey Ward Locke*, 283 F.2d 521, 151 Ct.Cl. at 270, plaintiff would still be precluded from obtaining its anticipated profits from its predicted future sales, except for its five confirmed CT scanner sales, *see* discussion, *infra*. Because its sales are premised on speculation, as opposed to confirmed orders or "clear and direct proof that it would have made such gains," *Nolan Bros. Inc.*, 405 F.2d 1250, 186 Ct.Cl. at 610, plaintiff is precluded from recovering such anticipated profits. While the court is aware of the legal principle that where damages clearly have been established, there being no "intervening efficient causes", the lack of certainty and preciseness will not preclude *some* recovery. Even in these cases, however, "any such recovery must rest on a reasonable basis of computation." *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 719 (1984). Moreover, all asserted factors entering into such computations, where at

all possible, must be verified and all such substantial factors should also have existed contemporaneously with the occurrence of alleged losses, not just prior to trial. *See Dale Construction Co. v. United States*, 161 Ct.Cl. 825, 832 (1963).

While plaintiff has adduced evidence of future CT scanner sales and diminished value of its business, e.g., PX–47, "CT Equipment Sales 1973–1981 U.S.A. and Japan Probable AS & E Unit Sales", such evidence (except for the five confirmed CT scanner orders, *infra*) does not rise to the level required to allow plaintiff to recover. *See Dale Construction Co.*, 161 Ct.Cl. at 832. For example, plaintiff's chart entitled "Revised Summary of AS & E Unit Sales Estimates Developed From Alternative Scenarios 1977–1981, U.S.A.", which was primarily relied upon by plaintiff to *predict* the number of fourth-generation CT scanner sales it would have sold during the 3-year time period, itself rested on at least four of the five following speculations or assumptions:[6] (1) AS & E equipment was available for installation beginning in 1977; (2) AS & E did not withdraw from the market; (3) AS & E pursued sales and production in earnest; (4) Technicare & Picker marketed stationary detector systems and encountered historic manufacturing complications; and (5) which perhaps may be the most decisive and critical assumption, that plaintiff indeed possessed the ability to successfully market, maintain, and repair its fourth-generation CT scanners.

As previously discussed at length, there was strong evidence to the contrary; the record was replete with the complaints from AS & E customers regarding AS & E's *inabilities* to successfully market, maintain, and repair, its fourth-generation CT scanner. This evidence, was substantially uncontroverted by plaintiff. This court is therefore constrained to find that plaintiff's predictions as to the number of lost sales (or diminished value of its business) are too uncertain because they are based upon assumptions and speculations

---

6. PX–47, page 35.

at least some of which are directly contrary to the substantial evidence in the record. In particular, plaintiff's four-admitted presumptions in its prospective CT scanner sales chart[7] all rise or fall with the 5th assumption supplied by the court; that AS & E was able to successfully market, maintain, and repair its fourth-generation CT scanner machines so to generate that goodwill throughout their customers which would establish the credibility of this neophyte company. Unfortunately, the evidence demonstrated just the opposite—that its customers were dissatisfied, displeased, and disturbed regarding the inability of AS & E to successfully market, maintain, and repair its fourth-generation CT scanner. Since assumption five is the linchpin that must support the other four assumptions plaintiff has adduced, its loss extirpates plaintiff's other four assumptions, rendering plaintiff's prospective sales chart valueless and unavailing.

### III. *Anticipated Profits from Plaintiff's Five Confirmed CT Scanners*

■ The court finds that an "intervening efficient cause" indeed does exist based upon: (1) the interference proceeding which debilitated the effectiveness of the "imprimatur" by transforming it (by preventing the patent from issuing within the 3-year period) into an *"inchoate* imprimatur"; (2) the inability of AS & E's own sales and service organization to effectively market, service, and repair its own CT scanner machine; and (3) the concomitant decline for

CT scanners during this 3-year time period due to the narrow interpretations given to the certificates of need. Nevertheless we believe that substantial mitigating circumstances surround the cancellation of five of plaintiff's confirmed fourth-generation CT scanner orders, sufficient to equitably permit the court to award plaintiff's anticipatory profits on these five cancelled orders. These mitigating circumstances are: (1) the critical time period, i.e., when confirmed-contract customers could have understandably reacted emotionally to the government's cancellation of plaintiff's 3-year "patent" license by cancelling their signed orders, was between July 21, 1977 to February 9, 1978[8]; (2) during this critical time period, five hospitals[9] cancelled their signed and confirmed orders[10]; (3) while none of the five hospital customers admitted that the reason for cancelling the confirmed orders was plaintiff's loss of the government's 3-year exclusive "patent" license, the court agrees with plaintiff that part of the reason was the negative impact brought about by the loss of the 3-year exclusive "patent" license; and (4) the amount of anticipated profits for these five cancellations were susceptible to a reasonably accurate mathematical formula based upon profit-loss data already in the record.[11] Based upon this profit-loss data in the record, in the nature of a jury verdict, *see S.W. Electronics and Manufacturing Corp. v. United States,* 655 F.2d 1078, 228 Ct.Cl. 333, 351 (1981); *Joseph Pickard's Sons Company v. United States,* 532 F.2d 739, 209 Ct.Cl. 643, 651–652 (1976),

---

7. PX–47, page 35.

8. Moreover, during this time period, the interference (the "intervening efficient cause") had *not* yet occurred. *See* "Summary of Relevant Dates and Events", *supra.*

9. Peter Brent Brigham Hospital, Ball Memorial Hospital, Bronson Methodist Hospital, Northside Hospital, and Medical University of South Carolina.

10. See DX–57 and the court's Finding of Fact 17.

11. The selling price and actual inventory cost for each fourth-generation CT scanner produced

and sold by AS & E is shown on PX–66. The court took the average of the stated profit margins therein for the 14 hospital sales shown in PX–66 (Michigan State, Johns Hopkins, Elliot Hospital, Children's Hospital, University of Colorado, Methodist Hospital, Toronto Western, Asahi Medical, Royal, St. Joseph's (Kansas), St. Joseph's (Colorado), Storment Vail, Crouse Irving, and Presbyterian) and determined the average margin of profit for each fourth-generation CT scanner sold to a hospital to be $107,187 per CT scanner. This profit margin was then multiplied by a factor of five to provide the total anticipated profits for the five confirmed orders lost through cancellations that occurred during the critical time period, which sum equalled $535,935.

the court finds that plaintiff is entitled to be awarded $535,935 in lost profits due to the cancellation of its five confirmed CT scanner contracts which were cancelled within the critical time period of July 21, 1977 (the date of the government's cancellation of the 3-year exclusive "patent" license) to February 9, 1978 (the date the interference was declared by the Patent and Trademark Office).

## IV. *Out-of-Pocket Losses*

■ Even where anticipated profits [12] and loss of business value are not awardable, however, proven out-of-pocket losses may be awarded if they are proximately caused by the breach. *See United States v. Behan,* 110 U.S. 338, 344, 4 S.Ct. 81, 83, 28 L.Ed. 168 (1884).

■ Plaintiff presented the court with a list of 16 out-of-pocket expenses totalling $2,777,563. The only out-of-pocket losses for which the government is responsible are those which AS & E incurred between January 21, 1977 (the date that AS & E was notified that it could expect to receive an exclusive license) and September 27, 1977 (when AS & E was put on notice that an interference was imminent, i.e., only those expenses incurred in reliance upon the exclusive license). Thus, the only out-of-pocket expenses awardable to plaintiff are $207,542, the expenses it incurred in terminating its production of its second lot of CT scanners.[13] Moreover, AS & E only had an expectation of obtaining patent rights between these dates, i.e., an inchoate imprimatur. In addition, the only losses between these dates which are awardable are those which AS & E would not have incurred but for the breach.

Plaintiff cannot recover any costs associated with its (1) entry into the CT scanner market, (2) expenses it would have borne even if it had never received the exclusive license, such as marketing costs, research and development costs, and general and administrative expenses relating to the CT scanner business, and (3) the decision to sell its CT scanner business to Pfizer and its concomitant losses.

### A. *Decision to Enter into the CT Scanner Market*

AS & E cannot recover expenses from its decision to manufacture its first 26 CT scanners, since it is clear that AS & E decided to enter the CT scanner market and to manufacture its first 26 CT scanners (first lot) before it had a reasonable expectation to receive an exclusive license. The decision by AS & E's president to go "all out to build 26 (CT scanner) units" preceded AS & E's receipt of the Determination of Rights letter advising it of HEW's initial decision to grant it an exclusive license.[14] These costs, like market entry costs, occurred before January 21, 1977, while it was still doubtful whether AS & E would be approved for an exclusive license.

AS & E also seeks to recover its marketing costs, research and development costs, and general and administrative expenses relating to its CT scanner business. These too, however, are expenses which are incident to AS & E's decision to enter into the CT scanner business—a decision made on March 2, 1976, a date not only prior to the date AS & E was notified that it could expect to receive an exclusive license, but also prior to the date AS & E filed the Stein '556 application.

Moreover, AS & E had to incur research and development expenses in order to enter into the CT scanner market and complete the development of its production CT scanner. In order to manufacture its new fourth-generation CT scanner, it had to design and build a backprojector and rewrite software. In fact, the majority of the research and development expenses incurred by the Instrument Systems Division of AS & E for FY'78 consisted of expenses con-

---

12. The court has denied all anticipatory profits occurring after the date of the Patent and Trademark Office interference.

13. Defendant concedes this amount.

14. See DX–21, DX–22, PX–33, Annis Tr. 712, 937–38.

cerned with the design and development of its new fourth-generation CT scanner. It appears that these expenses were necessary to commence the production of AS & E's first lot of 26 CT scanners, rather than being needed as a result of the exclusive license.

### B. *Expenses AS & E Would Have Borne Even If It Had Not Received The Government's Exclusive License*

AS & E seeks recovery of $491,325 which represents interests on the amount it had invested in inventory for its CT scanner production in excess of customer advances. Customer advances on AS & E's initial units were unusually low when compared to its competitors. This reflected an internal decision within AS & E, and was not caused by the government. Moreover, it in part reflected a general risk of the CT scanner business, since material cost is high and generally cannot be covered by initial customer advances. In one of its sales to the University of Colorado, AS & E required *no* advance whatsoever prior to shipment. In contrast, EMI, when it first began selling CT scanners, charged a $100,-000 non-refundable deposit. Thus, to a large degree, the difference between AS & E's investment and its customer advances or deposits prior to delivery, reflected a self-induced business judgment which incorporated competitive considerations and how much the particular customer could afford.

### C. *The Decision to Sell its Fourth-Generation CT Scanner Business to Pfizer and its Concomitant Losses*

The government is also not liable for items related to the sale to Pfizer. The government's breach did not, in and of itself, force AS & E to sell its CT scanner business to Pfizer. As previously discussed at length, there are one or more "intervening efficient causes" which destroyed the nexus between the government's breach and AS & E's decision to sell to Pfizer. Thus, all expenses incurred by AS & E in settling its accounts with Pfizer are not awardable.

AS & E seeks $332,671 representing inventory, tooling and trades shipped to Pfizer Medical Systems, Inc. ("PMS") under both the Scanner Purchase Agreement and a separate Triad Agreement.[15] PMS contended that these items were damaged or subject to other offsets.[16] According to AS & E's treasurer, however, AS & E relinquished its claim against PMS for payment of these amounts when the parties settled their outstanding accounts.[17] This again was an internal business decision by AS & E—a decision not forced upon it by the government. AS & E could just as well have chosen to pursue its claims against PMS, assuming those claims were meritorious. The same reasoning applies to AS & E's claims for interest amounting to $105,-812 on items invoiced to PMS.

AS & E also seeks payment of $154,860, representing charges for material handling and general and administrative expenses that it did not include in its agreement to manufacture triads for PMS. Because the Triad Agreement was entered into on September 13, 1978, long *after* the PMS license, it bears little causal relationship to even the PMS license or the exclusive license cancellation, and therefore must be denied.

### V. *Foreign Rights*

In its agreement with AS & E, the government waived its claim on foreign patent rights. This allowed AS & E to file foreign patent applications and retain all patent rights which issued. When the government cancelled AS & E's exclusive domestic patent license, it also purported to revoke its waiver of foreign rights.

AS & E filed applications for patents in over 40 foreign countries. It obtained at

---

15. DX–59; Siegelman Tr. 2205–06.

16. Siegelman Tr. 2182, 2203–04.

17. DX–96; PX–72, lns. 1–5.

least 24 patents. However, AS & E did not lose any of these patent rights. The government's breach was not enough to actually revoke AS & E's foreign rights. In order for the government to reclaim any of these foreign patents, the government would have had to require AS & E to transfer title from AS & E to the government. It never made such a demand.

The only foreign market in which AS & E alleges that the breach caused lost profits is Japan, a country in which no patent ever issued to AS & E. AS & E was to have marketed its scanner in Japan through a Japanese distributor, Asahi Medical. Asahi had a reputation for credibility and reliability in Japan. AS & E's small size was not a disadvantage in the Japanese market due to its affiliation with Asahi. Since technology was of greater significance in the Japanese than American market, and there were no Japanese CT scanner manufacturers, AS & E's excellent image quality might have been enough to sell scanners to Japanese hospitals. Thus, no "imprimatur" was needed in the Japanese market. In addition, AS & E has not shown that use of the license as an "imprimatur" would be effective in Japan.

AS & E applied for a Japanese patent but no patent was granted. Even if a patent had issued, there is no indication that AS & E would have been required to assign the title to the U.S. government. Therefore, AS & E cannot recover lost profits from the Japanese market under patent rights or "imprimatur" theories.

■■■ The government's revocation of foreign rights had no impact on AS & E and therefore does not affect this court's decision. The only reason for AS & E to introduce evidence of potential sales in the Japanese market would have been to show its ability to sell as many scanners as it was capable of producing, even if not in the American market. Since a determination of production capacity would become necessary only upon plaintiff's showing of causation between the breach and lost profits, the court need not address that question.

## CONCLUSION

AS & E did not acquire any patent rights because no patent issued on the fourth-generation CT scanner during the term of the 3-year exclusive license. The non-issuance was not caused by the government's breach of the exclusive license, but rather by the declaration of an interference proceeding by the PTO. Moreover, because the government is presumed to have handled the interference proceeding in a proper manner, plaintiff is precluded from presuming that a patent should have issued during the 3-year exclusive license period. This leaves plaintiff with only an unenforceable inchoate "imprimatur" which, by itself, is ineffectual. The government therefore did not proximately cause any damages under either plaintiff's patent theory or "imprimatur" theory.

Plaintiff's averred losses of anticipatory profits were substantially all caused by at least one or more of the following factors: (1) the 4-year interference proceeding; (2) the inability to successfully market, maintain, and service its fourth-generation CT scanner; and (3) the declining CT market in the United States due to the imposition of certificates of need. Therefore, except for the five cancellations of confirmed CT scanner orders which occurred prior to the interference, defendant is *not* liable for any anticipatory profits.

Although the government purported to revoke foreign patent rights, this did not occur. Moreover, AS & E claims lost profits in Japan, a country where AS & E did not have an issued patent. AS & E therefore has no basis to substantiate a damage claim for the revocation of its foreign patent rights.

Plaintiff has shown that the government's breach proximately caused $207,542 in out-of-pocket losses and $535,935 anticipatory profit losses for the cancellation of its five confirmed CT scanner orders that occurred prior to the interference proceeding. Plaintiff's recovery is therefore limited to $743,477 and the Clerk of the Court is

directed to enter judgment for plaintiff in that amount.

IT IS SO ORDERED.

### FINDINGS OF FACT

1. On September 27, 1976, AS & E filed Patent Application No. 726,556 for Tomography Scanning with Radiant Energy Source and Detectors Relatively Displaced, naming Jay A. Stein and Lawrence A. Shepp as inventors (hereinafter "the Stein '556 application") (PX–22, p. 1). At the time the Stein '556 application contained five claims with claims 2–5 dependent from claim 1. (PX–22, p. 18; Tr. 390) At the time the Stein '556 application was filed, its subject matter had been disclosed by AS & E in technical presentations and in a brochure prepared in April 1976. (PX–22, pp. 52–53, 65–69; PX–41, Tab Y, p. 4 (Chronology) Enclosure 6. *See also,* PX–42) In the first Office Action, dated June 6, 1977 (PX–22, pp. 26–28), the examiner rejected all claims as anticipated or rendered obvious by United States Patent No. 3,778,614 issued to Hounsfield and owned by EMI. (PX–22, pp. 26–28; Tr. 388–389) This was the status of the Stein '556 application on June 17, 1977, the date the exclusive license was granted to AS & E. (PX–41, Tab BB; PX–22, p. 77)

AS & E promptly responded to the initial rejection of claims by filing an Amendment on June 21, 1977. (PX–22, pp. 29–35; Tr. 389) AS & E's then patent counsel, Mr. Heiken, pursuant to a telephone interview with the examiner on June 8, 1977, agreed to amend the claims to distinguish them from the Hounsfield reference and to provide the results of a patentability search, earlier conducted by AS & E, to expedite the prosecution. (PX–22, p. 31; Tr. 389)

The sole independent claim, claim 1, was amended to the following form:

Radiant energy imaging apparatus comprising,

a source of a fan beam of penetrating radiant energy located outside the region to be imaged,

an array of contiguous radiant energy detecting means located about an axis of rotation for converting incident penetrating radiant energy into a corresponding detected signal,

and means for angularly relatively displacing said source and said array about said axis and keeping one of said source and said array essentially stationary to sequentially illuminate different groups of said detecting means progressively angularly displaced about said axis to provide a sequence of detected signals representative of the radiant energy response of said region which is between the path traveled by said source relative to said array and said array.

(PX–22, pp. 29–30, *see also,* PX–22, p. 18) Three additional dependent claims, claims 6–8, also were added. (PX–22, p. 30) The results of a prior art search were also reported in the response. (PX–22, pp. 33–34; Tr. 389)

2. On July 14, 1977, the examiner issued an Office Action indicating that claims 1–8 were allowable, closing prosecution on the merits. (PX–22, p. 36) This Office Action mentioned a personal interview with Mr. Heiken on June 21, 1977, and a telephone interview of June 28, 1977. (PX–22, p. 36; Tr. 390) It also noted that an examiner's amendment would follow. (PX–22, p. 36)

On July 21, 1977, that examiner's amendment was filed, amending claim 1, as discussed during Mr. Heiken's interviews with the examiner, as follows:

Radiant energy imaging apparatus comprising,

a *single* source of a fan beam of penetrating radiant energy located outside the region to be imaged,

an array of contiguous radiant energy detecting means located about an axis of rotation <u>subtending a substantial fraction of a complete circle about said axis</u> for converting incident penetrating radiant energy into a corresponding detected signal,

and means for angularly relatively displacing said source and said array about said axis and keeping one of said source

and said array essentially stationary to sequentially illuminate different groups of said detecting means progressively angularly displaced about said axis to provide a sequence of detected signals representative of the radiant energy response of said region which is between the path traveled by said source relative to said array and said array. (Underlining indicates words added by Amendment.)

(PX–22, p. 38; *see also*, PX–22, pp. 29–30) Apparently, this amendment was entered to distinguish the claims from United States Patent No. 4,031,395, issued to LeMay on June 21, 1977, and cited by the examiner as a reference. (PX–22, pp. 36–37; Tr. 394–95; *see also*, PX–22, pp. 34–35, 47–48)

3. A Notice of Allowance was sent on September 20, 1977, and the issue fee paid on September 26, 1977. (PX–22, p. 7, 45; Tr. 398–99; *see also*, PX–22, p. 49) However, on September 21, 1977, the examiner requested and received permission from the Director of his Examining Group to withdraw the Stein application from issue for the purpose of establishing an interference. (PX–22, p. 44; Tr. 400–01) On September 27, 1977, the Patent and Trademark Office ("PTO") sent AS & E's counsel a notice informing him of the decision to withdraw the Stein application from issue, which was received on October 1, 1977. (PX–22, p. 46; Tr. 403)

AS & E filed a "Petition Under Rule 181" on October 11, 1977, in an attempt to persuade the Commissioner to overturn the examiner's decision to set up an interference. (PX–22, pp. 49–60; Tr. 403) AS & E argued that if the interference was declared, AS & E would be irreparably harmed since its exclusive license would expire *before* the interference was concluded. (PX–22, pp. 51, 59) It suggested that AS & E's patent be allowed to issue and that EMI be allowed to copy its claims, making the interference one between a patent and a pending application, rather than between two pending patent applications. (PX–22, p. 60) However, the PTO denied

AS & E's petition on October 25, 1977. (PX–22, pp. 77–78; Tr. 405) The PTO noted its statutory obligation to resolve questions of priority of inventorship and further suggested that the interference was a "burden of patent prosecution" that AS & E had agreed to assume in its exclusive license. (PX–22, p. 27) The PTO, however, did direct that the handling of the Stein application be expedited. (PX–22, p. 78) A Petition for Reconsideration, filed by AS & E on November 4, 1977, was denied on December 20, 1977. (PX–22, pp. 79–82, 83–84)

4. The examiner's decision to withdraw the Stein application from issue was based upon the contention of patent counsel for EMI that the same invention was disclosed in Application No. 772,689, filed on February 28, 1977, by Colin Charles Oliver. (PX–23, p. 1, 59) On August 8, 1977, EMI filed a preliminary amendment to the Oliver application amending the claims and directing the examiner's attention to the Stein application. (PX–23, pp. 56–59; Tr. 409) An incomplete copy of the specification and drawings, but not the claims, of the Stein application was attached. (PX–23, pp. 60–66) A second preliminary amendment was also filed on July 28, 1977, adding a new claim which broadly claimed a scanner with a stationary circular array of detectors and a rotating source. (Pollock Tr. 408; PX–23, p. 68) Again, the examiner's attention was directed to the Stein application. (PX–23, p. 69) Finally, a third preliminary amendment was filed on September 19, 1977, adding claims 9–13 which were copies of claims 1–5 of the Stein '556 application. The amendment set forth the support for these claims in the Oliver application and requested that an interference be declared. (PX–23, pp. 80–83)

On October 27, 1977, the examiner suggested that EMI copy a claim corresponding with claim 1 of the Stein application in order to provoke an interference. (PX–23, pp. 78–79; Tr. 409) This Office Action was signed by Examiner Church, who was the examiner of the Stein application, whereas the Second and Third Preliminary Amend-

ments were directed to a different examiner, T.N. Grigsby, in the same Art Unit. (PX–23, pp. 68, 78, 80) EMI copied the suggested claims in an amendment filed November 22, 1977, as claim 15. (PX–23, pp. 84–86)

5. On February 9, 1978, an interference was declared between the Oliver application and the Stein '556 application, with claim 1 of the Stein '556 application constituting the sole count. (PX–22, pp. 85–87; PX–23, pp. 88–90) Oliver was given the benefit of a British application, filed March 3, 1976, and therefore, designated senior party. (PX–22, p. 87; Tr. 549)

6. On February 1, 1979, a motion made by EMI to substitute a broader claim as the sole interference count was granted. (DX–101, pp. 12, 14) The claim was copied in the Stein application and the interference was redeclared in April 1979. (DX–101, p. 16; *see also*, DX–101, p. 15) The substituted interference count was:

A system for examining a patient comprising,

a stationary array of detectors of x-radiation surrounding the patient at least halfway

and means for generating x-radiation at an origin of x-radiation which origin moves around the patient along a path which does not coincide with the array of detectors and successively illuminates with a fan beam of x-radiation groups of said detectors which are at the time at the side of the patient opposite that of the origin. (DX–101, pp. 48–49)

7. Subsequently, in May 1981, the interference was again redeclared as a result of EMI prevailing on a motion to substitute LeMay Application Serial No. 946,644 for the Oliver application. (DX–101, p. 26) This had a significant effect since the LeMay application had a priority date of March 20, 1975, predating the priority date of the Oliver application by about one year. (DX–101, pp. 26–27)

A settlement of this interference was reached between the Government and EMI on September 17, 1982, with the Government abandoning the interference contest and receiving a royalty-free nonexclusive license under EMI's patents to the extent necessary to practice the interference count. (DX–1011, pp. 47–50)

8. In a letter from Dr. William Hendee dated September 8, 1978, complaining about AS & E scanners, he states, "as we discussed by telephone a couple of weeks ago, since installation of our AS & E scanner we have experienced considerable down time which has prevented us from meeting our clinical obligations in any way approaching that which is necessary. This down time problem continues to exist for first one reason, then another, with no indication that it will be remedied in the immediate future.

"We are concerned that AS & E may contend that the 1-year warranty period for our scanner has ended before we achieved dependable and uninterrupted use of the scanner." (DX–98)

9. In a February 14, 1978, internal memorandum of the AS & E company, it states "As you can see from the attached sheet, we now have over $3,000,000 due AS & E on CT scanners delivered but not yet accepted." Moreover, in the handwriting of one of the members of AS & E's high-level staff, Jim Powers, it states "Of the 7 scanners, 6 are *problems* associated with acceptance."

10. In a letter dated August 9, 1978, from Johns Hopkins University School of Medicine and Johns Hopkins Hospital to AS & E complaining about AS & E's fourth-generation CT scanner, the hospital states: "On August 15 and 16, 1978, (Tuesday and Wednesday) the AS & E will be down to complete the 5-second modification, as well as to accomplish as many of the following open items as possible. These open items are an accumulation of things that should have been done since the system was first installed; up to and including present work that must be accomplished. *Our AS & E system, visually and functionally, does not look or act like a high priced, high quality scanner. Things are lacking cosmetically, as well as functionally for the*

*equipment to be deemed acceptable."* [Emphasis supplied.] The letter goes on to state specifically a number of problems which are labeled A, B, C, D, E, F, G, H, I, J, K, L, M, N, and after those specific problems, that letter states: "These problems added to our other daily operational problems of data drop outs, snow pictures, detector failures, bed positioning glitches when powering up system, rotary motor clutch drop out, overload of bed fuses under normal operation, overheating of the DCL logic boards, no angular table read out device and finally pictures with beam hardening shadows, leave me with a large question as to when these problems will be resolved."

11. An internal memorandum of AS & E dated August 26, 1977, clearly reflects the internal production problem AS & E was experiencing during this period, i.e., the inability to smoothly produce their fourth-generation CT scanner. In the memorandum from G.W. Alrich to J. Stein, Mr. Alrich states: "As you know, we are in an incredible crunch to produce and ship units. Recently we have had a series of destructive incidences in which production scanners have been cannibalized for parts needed in various development projects.

"This has, in effect, taken computer systems that were finished and checked out and turn them into a nonworking piece of equipment. We then need more money and more labor time to put them back into acceptable condition. Some of these incidences occur after hours and others occur during the day. Dan Silva and other production people are not informed.

"We have lost equipment and we have equipment that is not usable. Nobody wants to hold up any development project; but midnight requisitioning and contempt for the production people is wrong." (DX-55)

12. An internal memorandum of plaintiff dated August 4, 1977, reflects the problems plaintiff had with production and with its sales force. The memorandum from Mr. Franklin to AS & E's president, Mr. Annis, stated, "We have not met the pre-scribed production schedule in August. (We have promised September 22nd.)" And in the opinion of Dr. Don Taylor, Chief Radiologist, "We (AS & E) have a limited sales force for this product." Dr. Don Taylor, Chief Radiologist of Ball Memorial Hospital, Muncie, Indiana, complained about the service rendered by AS & E regarding its fourth-generation CT scanner. (DX-48)

13. On January 24, 1979, a meeting was held between Children's Hospital in Pittsburgh, CT scanner Unit, Pennsylvania, and AS & E. In that meeting, numerous problems encountered with the AS & E fourth-generation AS & E scanner were the following: (1) high standard deviation (7–8); (2) streaks on scan in 5-second mode; (3) the spacial resolution is down by 75%; (4) AYDIN display warmup problem; (5) metal chips getting into X-ray port; (6) intermittent mechanical interlock; (7) slice thickness; (8) CT drift; (9) warranty; and (10) site coverage.

While AS & E apparently intended to resolve all of the above problems as soon as they could, there were other problems that AS & E had no plans to resolve. Among these problems mentioned were: (1) head holder (AS & E's only model has been supplied); (2) sagital and coronal reconstruction; (3) program for localization; (4) continued software update for model no. 0500; (5) rotor artifact; (6) change in collimator system to reduce dose; (7) CT number stabilization correction system; and (8) improved X-ray tube. (DX-42) In a February 26, 1979, letter from the Michigan State University Department of Radiology addressed to Mr. James Powers of AS & E, Dr. E. James Potchen, Professor and Chairman of the Radiology Department of Michigan State University, complained strongly about the quality of the AS & E fourth-generation CT scanner: "The software supply to MSU must be convenient for radiologists to employ in the clinical setting and must produce a clinically useful image. In accord with your statement that 'everything AS & E produces is first-class', I certainly will *not* accept a crude or multi-

planar reconstruction software update." [Emphasis supplied.] In regard to his complaint regarding "high image noise," Dr. Potchen stated: "No progress has yet been made in completing the installation of the 5-second scanning mode. Our images remain objectionably mottled in appearance, and, clearly, the image quality is not commensurate with the delivered patient doses and the image quality of other AS & E machines." (DX–41)

14. In a January 18, 1977, letter from Cyprus Community Hospital in Pompano Beach, Florida, written by Dr. Joseph V. Cusmano, to Mr. Martin Annis, President, American Science & Engineering, Inc., Dr. Cusmano states: "I am writing to express my *disappointment* and *disgust* with the performance of your company relating to your contract to deliver to my group a CAT scanner at Cyprus Community Hospital in Pompano Beach, Florida. At the time of our down payment, we contracted for delivery on or about December 15, 1976. I was informed later that delivery was firm for the third week in Febuary [sic]. This was disappointing enough but, for months, this date was re-affirmed repeatedly by your representative. Based on this, we will have completed a room for acceptance of the unit by Febuary [sic] 15, 1977. This was accomplished at considerable expense, and in spite of numerous changes and other obstacles presented by deficiencies in your company's various departments. I called this morning to inform your people that we will be ready and was told that delivery was delayed again until March 18! Mind you, *I had to call your company* to find this out! Further, small petty jokes were made in regard to this shocking news."

Dr. Cusmano further added in his letter to AS & E: "May I point out that American Med. Corps. has been observing this purchase with interest and now I am sure with similar disgust and outrage. Through personal efforts, I arranged for Mr. Paul Powell, the Chief Purchasing Agent, to visit your facility and indeed he is alot smarter than I am, for he perceived the *inability of your company to produce on any kind of*

*schedule. You can be sure AS & E is a dead horse* with AMI now, which incidently has caused me much personal humiliation.

"Contacts between our construction people and your firm has resulted in a stream of negative invectives against AS & E! I have been put in a position of having to continually defend your company! But, now I have had it. The crowning blow was that I had to call to get the bad news! What kind of business are you running up there?" [Emphasis supplied.] (DX–32)

15. A letter from Dr. William B. Seaman of the Surgeons of Columbia University, New York, complains about the excessive down time of the AS & E fourth-generation scanner, the slow patient throughput, and the need for an improved camera. In regard to the down time, Dr. Seaman states: "Although I have not kept adequate records, the *down time so far has exceeded the operational time.* This is true even including operating the machine when serious artifacts are present in the image." In regard to the problem regarding the need for an improved camera, Dr. Deaman stated: "The image on the CRT is much superior that that which we obtained on the film via the Dunn camera. It seems a shame to spend all this money and effort to obtain a high quality image and lose a significant portion of the quality in the reproducing equipment." He adds: "We are still unable to test the entire range of the equipment. For example, we are still limited to a 10-second scan and are unable to test out the 5-second scan time which supposedly the equipment is capable of." He closes by saying: "We are anxious to enlarge our clinical experience and seem frustrated particularly by the constraints imposed by the *down time* and slow patient throughput in particular." (DX–28)

16. In an internal memorandum dated August 3, 1977, from James E. Powers to Martin Annis, President of AS & E, Mr. Powers states: "Received a call from Roy Erickson, President of Ball Memorial about 4 p.m. today notifying me that they were

sending a cable to you cancelling their order. He stated that the two basic reasons were delay in delivery and continued uneasyness regarding the service capability to be provided by AS & E in Muncie. I asked him what we could do to allay these unfounded fears and he said there was nothing, since they have had meetins [sic] regarding this procurement and the Board of Directors had voted this today." (DX–27)

17. When plaintiff was asked in an interrogatory by defendant to state how many orders were their fourth-generation CT scanner were cancelled and for each give the date of the order, the date of the cancellation, and the name of the ordering party and the reasons given for each cancellation, the following response was received:

Nine orders for scanners have been cancelled as follows:

| Date of Order | Customer | Approximate Date of Cancellation | Reasons stated by Customer for Cancellation |
|---|---|---|---|
| 6/25/76 | Cyprus Community Hospital 600 S.W. 3rd Pompano Beach, Fla. 33060 | 2/23/77 | Delay in delivery |
| 6/28/76 | Computed Tomography Ltd. Phoenix, Ariz. | 9/27/76 | Decided to defer purchasing |
| 6/30/76 | St. Joseph's Hospital 5665 Peachtree-Dunwoody Road, Atlanta, Ga. | 4/11/78 | Delay in delivery |
| 1/26/77 | Peter Bent-Brigham Hosp. (Scientific Leasing, Inc.) 721 Huntington Boston, Mass. | 7/1/77 | Delay in delivery |
| 2/21/77 | Victory Mem. Hospital, Waukegan, Ill. | 4/26/77 | Cost of scanners beyond scope of permit previously issued to hospital by Illinois health facilities planning board |
| 3/3/77 | Ball Mem. Hosp. 2401 Univ. Ave. Muncie, Ind. | 8/3/77 | Delay in delivery and uneasiness regarding service capability of plaintiff |
| 4/7/77 | Bronson Methodist Hosp. 252 E. Lovell Kalamazoo, Mi. | 12/16/77 | Delay in delivery |
| 5/6/77 | Northside Hosp. 1000 Johnson Ferry Rd. Atlanta, Ga. | 12/23/77 | Decided on an EMI system |

| Date of Order | Customer | Approximate Date of Cancellation | Reasons stated by Customer for Cancellation |
|---|---|---|---|
| 7/7/76 | Medical Univ. of South Carolina 80 Barr St. Charleston, S.C. | 10/13/77 | Delay in delivery and dispute concerning specification |

(DX–57)

18. During plaintiff's 3-year exclusive time period, June 1977 to June 1980, the market demand for CT scanners declined. In a publication entitled "History of the CT Scanner Industry" as published in *Biomedical Insight*, it stated as of December 1977 "Industry reportedly experiencing *shrinking demand coupled with overcapacity.* 1978 will be a stand-still year for the industry with an expected 100–200 units delivered." (DX–87, p. 3) Moreover, the summary adds as of March 1978, "EMI plunges into red drops U.S. work force by 30%; now has suits against Pfizer and GE and expands suits against Technicare. Technicare also dropping financially as demands shrink due to C.O.N. ceiling." (DX–87, p. 3)

19. In an internal Pfizer sales memorandum entitled "Key Market Factors" relating to the U.S. market for CT scanners, Pfizer states: "1977 witnessed the unequivocal acceptance of the CT of the head as a primary modality for diagnosis of pathology of the brain. . . . Despite portents of increasing long-term demand for scanners, however, the size of the domestic CT market in 1978 will be defined by the number of certificates of need (C.O.N.) issued by the state health planners. Virtually every state in the nation now has regulatory authority over the purchase of CT scanners by hospitals either through Public Law 93–641, which establishes certificate of need requirements, or Section 1122 of the Social Security Act, which provides for withholding Medicare and Medicaid reimbursement for a hospital's capital investment unless the expenditures are approved by the state review authority. In addition, private purchase of CT scanners is now restricted in 22 states, either by a state requirement that an individual obtain a certificate of need, or by a Blue Cross/Blue Shield policy requiring a certificate of need as a condition of reimbursement.

"Although the same regulatory structure existed a year ago, it was not anticipated that it would be *utilized so zealously* by health planners and legislators to clamp down on CT scanners, whose high visibility and price tag made them a natural target of cost containment efforts." The memo continues by stating that the figures demonstrate a 16% decline of CT sales from the full 1977 estimate and a 47% reduction of CT scanner sales from 1976." (DX–97, pp. 1, 2)

20. In the *Biomedical Insight* publication of December 21, 1977, regarding the market decline for CT scanners, the report stated: "For the first time since 1973, there were longer odds and longer faces on more than one CT scanner entrant, as more of the combatants in this hot, high-ticketed industry start to feel the *chill of a shrinking demand,* coupled with gross overcapacity and the widespread abundance of technological overkill. Combined, they are helping to forecast 1978 as a cheerless selling climate in the U.S., worse than has occurred at any time during the past half-decade.

"The overall scanner situation is much worse than anyone involved in that industry will readily admit. Lower-priced units, o.e.m. deals and marketing stunts are a sure sign of troubles. The 15 companies currently are competing in the U.S. for under 100 outstanding, unfilled and uncommitted certificates of need." (DX–90, p. 1)

21. In an internal AS & E memorandum dated November 10, 1977, AS & E also recognizes the restrictive ramifications of the certificates of need, saying: "The federal guidelines will affect all new CT certificates of need. Most of the customers don't realize to what extent and will be

**160**

miffed when their certificates of need are denied." (DX–49)

22. Some customers were reluctant to purchase a scanner before it was in operation in at least one clinical setting. (Annis Tr. 917; Ellenbogen Tr. 1518–21; Barnes Tr. 368) Plaintiff admits that General Electric had a large presence, good name, high credibility in the medical imaging field, and numerous resources to call upon to solve any technological problem that developed in its machine. (Gembel Tr. 1393–94, 1445–49) Moreover, plaintiff admitted that both price and certificates of need were relevant considerations in limiting the number of sales of fourth-generation CT scanners on the market. (Gembel Tr. 1432, 1459–60, 1441, 1449)

23. Even as late as 1979, the AS & E scanner, now sold by Pfizer, suffered from a high downtime and unreliability in its performance. (PX–46, p. 167)